# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| Robert W. Orlick, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 3:12-cv-41 |
| vs. | ) | |
| | ) | **REPORT AND** |
| Grand Forks Housing Authority, Liz | ) | **RECOMMENDATION** |
| Simpson, Nancy Brander, Sherrie LeQuire, | ) | |
| Homestead Place, Inc., Brad Hillebrand, | ) | |
| Terry Hanson, and Matt Martin, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff Robert W. Orlick ("Orlick"), who is proceeding *pro se* and *in forma pauperis*, filed a complaint. Shortly thereafter, Orlick filed a motion to amend the complaint to add defendant Homestead Place, Inc. (Doc. #8), and a motion to amend the complaint to correct the spelling of a defendant's name (Doc. #9). Prior to the court ruling on the motions, Orlick filed a motion for leave to file an amended complaint. (Doc. #10). The proposed amended complaint included the additional defendant and the correct spelling of the defendant's name at issue in Orlick's motion. The court granted Orlick's motion for leave to file the amended complaint, and found that Orlick's motions to amend were moot in light of the amended complaint. (Doc. #12). Orlick was advised that once a plaintiff files an amended complaint, the original pleading no longer serves any function in the case.

Orlick then filed a motion to withdraw the amended complaint and reinstate the original complaint. (Doc. #17). Orlick's motion to withdraw the amended complaint was granted. (Doc. #23). The court vacated its previous order finding as moot Orlick's motions to amend the original complaint to add the additional defendant and to correct the spelling of a defendant's name, and granted the motions. (Doc. #23). Additionally, Orlick filed a motion to amend the

original complaint to include Terry Hanson as a defendant (Doc. #19), and a motion to amend the original complaint to include Matt Martin as a defendant (Doc. #26). Because the court had not completed its initial review of the original complaint pursuant to 28 U.S.C. § 1915(e)(2), Orlick's motions to amend to add additional defendants were granted. The court now conducts its initial review of the *in forma pauperis* complaint pursuant to 28 U.S.C. § 1915(e)(2).

## Summary of Recommendation

Orlick's action involves what are essentially landlord-tenant disputes. Orlick has not stated viable and nonfrivolous federal claims for housing discrimination or invasion of privacy. It is **RECOMMENDED** that Orlick's federal claims be **DISMISSED** with prejudice. It is further **RECOMMENDED** that the court not exercise supplemental jurisdiction over the state law claims, and that those claims be **DISMISSED** without prejudice.

## Claims

Orlick's complaint alleges he was subject to housing discrimination based on age and disability, specifically an eye condition, and that he was subject to abuse, harassment, and invasion of privacy, including mail tampering and eavesdropping.[1] (Doc. #7). Orlick contends he was not allowed to use his hood or exhaust fan over his stove, he was not allowed to cook outside, a dispute regarding payment of his rent resulted in eviction threats, he was overcharged for maintenance repairs and repairs took too long, he was refused an updated apartment, disputes occurred regarding the common facilities, he was denied the right to breathe fresh air and was denied a request to change apartments which was required for "health reasons," and that

---

[1] Although Orlick specifically refers to abuse and harassment in his complaint, a review of the facts contained in the exhibits attached to the complaint reveal those claims actually relate to the landlord-tenant disputes.

defendant Liz Simpson ("Simpson"), who is the leasing and property manager for the Grand Forks Housing Authority ("GFHA"), starved the animals on the property. Id.

Orlick receives housing assistance through the GFHA and resides at the Homestead Building in apartment 105, were he has lived for more than ten years. (See Doc. #7-8, p. 2, letter from Orlick to a defendant noting how long he has lived in his apartment). Orlick's complaint, which is almost completely devoid of supporting facts, refers the court to several exhibits in support of his claims. The numerous exhibits provide the facts underlying Orlick's allegations. Accordingly, the undersigned magistrate judge has reviewed all of the exhibits in conjunction with the complaint, and provides a summary of the facts underlying Orlick's claims in the subsections below.

1.  Hood/Exhaust Fan Dispute

Defendant Sherrie LeQuire ("LeQuire"), Housing Administrator at the GFHA who was temporarily managing the Homestead Building, received complaints from Orlick's neighbors about the constant running of Orlick's kitchen exhaust fan. (Doc. #7-1, p. 2). On February 9, 2009, LeQuire advised Orlick that the fan should not be run 24 hours a day as it was disturbing other tenants in the building, the fan should only be used for cooking, and if Orlick was using the fan to purify the air or for noise suppression, he should consider buying a fan or air purifier. Id. Orlick disputed that he was using the kitchen exhaust fan 24 hours a day. Id. at p. 4. Additionally, Orlick stated that the fan is noisy and if management chooses to appease the complaining tenants, management may replace the exhaust fan with one that is quieter. Id. LeQuire responded that the fan had been replaced, that maintenance technicians stated it was operating at an acceptable noise level, and that the fan should not be operated in the late evening

hours because it disturbs other tenants.  Id. at p. 6.  LeQuire advised Orlick that disturbing the right to peaceful enjoyment of other tenants in the building is a lease violation, and repeated lease violations could lead to eviction.  Id.  In response to LeQuire's second letter, Orlick requested an independent expert to determine whether the fan was operating at an acceptable noise level.  Id. at p. 7.  Orlick also speculated as to who was complaining about the fan noise, and stated that the complainant also complained of another neighbor's vacuuming, which did not bother Orlick.  Id.  Orlick suggested that the complainant move, and noted that most "thinking people" would use ear plugs.  Id. at p. 8.

2. Outdoors Cooking Dispute

On April 11, 2012, Orlick received a notice of a lease violation for removing his window screen and placing a TV tray and toaster outside that was plugged into an outlet inside his apartment.  (Doc. #7-2, p. 2).[2]  Maintenance technicians had previously installed the screen on Orlick's window, and defendant Simpson advised Orlick that maintenance technicians would return to Orlick's apartment to install the screen a second time.[3]  Id.  Orlick advised defendant Terry Hanson ("Hanson"), Executive Director of the GFHA, that he had removed the TV tray.  Id. at p. 3.  However, Orlick noted that he had received permission to cook outside in the past, that other residents cook outside as well, and that the GFHA supports outdoor cooking by

---

[2] Orlick deemed the notice of a lease violation as harassment of a senior citizen.  (Doc. #7-2, p. 6).

[3] On February 6, 2012, Orlick was advised by Simpson that not having a screen on his window is a housing quality violation, and that she would be putting in a work order to have the screen put back on the window.  (Doc. #7-3, p. 2, Doc. #7-4, p. 4).  Orlick responded that having the screen on the window was a fire safety hazard, because it would take too long to remove the screen in the event of a fire.  (Doc. #7-3, p. 4, Doc. #7-4, p. 3).  Orlick requested that the fire marshal, or others, inspect the screens in the building.  (Doc. #7-3, p. 5, Doc. #7-4, p. 3).

4

furnishing grills for residents.[4]  Id. at pp. 4, 6.  Orlick requested that the GFHA supply him with a cooking unit suitable for his needs and an extension cord to reach the outside outlet.  Id. at p. 7.

3.      Rent Dispute

On April 11, 2011, Simpson sent Orlick a notice of termination of his Model Lease for Subsidized Programs because of non-payment of rent.  (Doc. #7-5, p. 7).  In response, Orlick sent letters to defendant Hanson contending he did not sign a Model Lease for Subsidized Programs and that he did not owe any rent.  Id. at pp. 2, 5.  Orlick regarded the notice sent by Simpson as a "deliberate, premeditated act, to harass a Senior Citizen."  Id. at p. 2.  Orlick may have sent a check for rent that was lost or not properly recorded.  See Id. at pp. 8-14.  Ultimately, on April 15, 2011, Simpson sent Orlick a letter stating that payment was received and the notice of termination of the lease was cancelled.  Id. at p. 15.

4.      Maintenance Disputes

On February 18, 2011, Orlick's range hood was replaced.  (Doc. #7-6, p. 3).  Orlick was charged for the labor and parts, and was advised that pursuant to his lease he was obligated to pay for damages caused by carelessness, misuse or neglect.[5]  Id.  Orlick responded that he was told by a maintenance technician that he would be charged $25.00 for an inspection of the range hood, and the technician later told Orlick the new range hood cost $40.00.  Id. at p. 5.  Orlick stated he would only pay the $25.00 inspection fee and for the cost of the new range hood, which was actually $38.95.  Id. at p. 6.  It is unclear based on the exhibits if the dispute was ever resolved.

---

[4] Orlick also complained about non-residents cooking outside.  (Doc. #7-2, p. 6).

[5] The range hood was dirty, the maintenance technician found it was not cost effective to clean, and therefore the technician bought a replacement range hood which required that the cupboard be cut so the new hood could fit properly in the space.  (Doc. #7-6, p. 7).

5

On April 25, 2011, Orlick sent a letter to Hanson stating that Orlick requested to have a door lock replaced, and in response Orlick was advised by letter that he would be charged $500.000. (Doc. #7-7, p. 6). Orlick did not include in his exhibits the letter advising him it would cost $500.00 to replace the lock, and it is unclear whether Orlick had his lock replaced.

On August 24, 2011, Orlick sent a letter to defendant Brad Hillebrand[6] ("Hilldebrand"), the former maintenance manager, regarding thermostats that were installed in the apartment units. Orlick stated that he was busy when the technician arrived for the appointment to install the thermostat, and Orlick did not have time to review the new thermostat with the technician. (Doc. #7-9, p. 2). Orlick suggested that management hold an instructional meeting regarding the new thermostats at which they should show blown up charts, however, Orlick noted he personally would not have time to attend such a meeting. Id. Orlick noted that more advanced thermostats are available on the market than those that were installed, but nonetheless he congratulated Hilldebrand on "going green," but noted that Hilldebrand was "about 20 to 30 years late to the party." Id. at p. 3. Orlick's chief complaint appears to be that the technician took too long to install the thermostat, and as a result Orlick's work was disrupted. Id. at p. 4.

On March 25, 2010, Orlick sent a letter to Hilldebrand complaining that "a man," presumably a maintenance technician, came to Orlick's apartment regarding a drain problem. (Doc. #7-10, p. 2). Orlick told the technician he did not have a drain problem. Id. Orlick stated that the technician tried to stay in his apartment "as long as possible." Id. Orlick alleged in the letter to Hilldebrand that the technician was trying to enter his apartment under false pretenses. Id. In the same letter, Orlick complained about the length of time it took maintenance

---

[6] It appears the defendant's last name is actually Hilldebrand. (See Doc. #7-1, p. 2).

technicians to replace two light bulbs. Id. at p. 3. Specifically, Orlick alleged that it took two maintenance technicians one hour to replace two light bulbs, and that the delay was intentional to harass Orlick. Id. at p. 4. Orlick stated that if authorized, he would hire his own contractors to make repairs and would send the resulting bills to the apartment managers. Id. at p. 5.

On January 15, 2013, Matt Martin ("Martin"), the Pest Elimination Inspector for the GFHA, sent the Homestead Apartment tenants a letter stating that a maintenance technician would be entering the units the next day to inspect for insects such as spiders, ants, and bedbugs as part of their pest control program. (Doc. #26-1). Orlick states that Martin came the next day and checked for bedbugs, and inquired if Orlick had any marks on his body. (Doc. #26, pp. 2-3). Orlick alleges Martin did not perform a "true" pest control inspection, and that his inquiry whether Orlick had any marks on his body from bedbugs constitutes age discrimination and harassment. Id. at p. 3.

5.  Refusal to Provide an Updated Apartment

On August 23, 2011, Orlick wrote a letter to Hanson requesting that he be kept in mind for an updated apartment with a full kitchen on the first floor, should one become available. (Doc. #7-8, p. 2). Orlick noted that he had requested to move to apartment 104 the previous year, but he was advised that his request to have the apartment "aired-out" for 30 days prior to his move would not be approved.[7] Id. Orlick stated that if an apartment should become

---

[7] Orlick included in his exhibits a letter he sent to Simpson on February 25, 2010, requesting that he be allowed to move to apartment 104. In the letter he requested that the apartment be aired out due to his allergies, that his curtain rods be transferred, and that his air conditioner be transferred if the one in the new apartment did not work properly. (Doc. #7-8, pp. 3-4). On February 28, 2010, Simpson sent Orlick a letter inquiring if he still wanted to transfer units, and she advised Orlick that if he did want to transfer he needed to contact her. Id. at p. 5.

available, he would like light color, "low pile carpeting" installed. Id. Orlick complained that the carpeting in his unit had not been changed and that it was likely the same carpeting that was installed in 1979 when the complex was built. Id.

6.  Dispute Regarding the Common Areas

On December 9, 2010, Orlick sent a letter to Simpson stating that one of the washing machines in the laundry room was in need of repair, and that the washing machines were too small. (Doc. #17-11, p. 3). He also complained that the second dryer was removed to make room for a vending machine, and that tenants on the second and third floors used the first floor laundry room. Id. In the same letter Orlick also complained about the quality of the shopping carts on the first floor.[8] Id. at pp. 3-4.

7.  Disputes Regarding Fresh Air and Requests to Change Apartments for "Health Reasons"

Orlick is concerned with indoor air pollution. As an exhibit, he provided the court excerpts from articles regarding the subject. (Doc. #7-13, pp. 4, 6). The articles discuss stagnant air, the dangers of carpets and furnishings giving off formaldehyde gas, and contaminants being spread through heating and cooling systems. Id. Orlick's concerns about air pollution are the impetus behind many of his claims.

On August 18, 2008, Orlick sent a letter to the Housing Administrator of the GFHA, who is not a named defendant in this action, requesting to move to an apartment on the opposite side of the building on the ground floor due to "health reasons," and he informed the Housing Administrator that he had requested a letter from his doctor. (Doc. #7-15, p. 5). That same date,

---

[8] According to Orlick, the shopping carts are used by personal shoppers for food deliveries. (Doc. #7-11, p. 4).

Orlick's doctor sent a letter to the building manager stating that Orlick "is currently experiencing some health issues" that "would be improved" if Orlick "were able to move his apartment to the opposite side of the building." Id. at p. 6. The doctor did not state what Orlick's health issues were or how they could be improved by moving to the other side of the building.

On September 16, 2008, Orlick received a letter from the Housing Administrator stating that during the most recent maintenance inspection it was noted that Orlick's tub and shower needed to be cleaned, and some stains on the carpet needed to be removed. (Doc. #17-12, p. 5). Orlick was told to clean the items and was advised whom to contact if he needed assistance. Id.

The next day, Orlick responded to the cleaning request, stating that he needed to change apartments due to "health problems" in his current apartment. Id. at p. 6. Orlick contended his shower was reasonably clean, but nonetheless he advised that he would have someone clean the bathroom. Id. However, Orlick stated that for "medical reasons" he could not replace the shower curtain. Id. at p. 8. With regard to the carpet, Orlick stated it was dirty and a health hazard, and should be replaced. Id. at pp. 6-7. He requested that the carpeting be replaced with tile and advised that he would request a medical statement from his doctor concerning the "uninformed suggestion that the carpet should be cleaned." Id. at p. 7.

On September 19, 2008, Orlick sent a letter to his doctor regarding his visit to the doctor's office earlier that day. Id. at p. 3. In the letter Orlick told his doctor, as he claimed he did at his doctor's appointment earlier that day, that Orlick has allergies and needs fresh air, exercise, and bland foods to maintain his health. Id. Orlick told his doctor that it is difficult to keep his apartment windows open because of traffic on that side of the building, and that Orlick does not think his "need for good clean fresh air is unreasonable." Id. (emphasis in original

9

omitted). On September 22, 2008, Orlick's doctor sent a letter to the Grand Forks Housing Authority stating that Orlick has "some associated medical problems that are related to his environment and . . . it would be best that Mr. Bob Orlick continue to live in his current situation without undertaking a major cleaning such as carpet cleaning, because there may be some detriments to his health if he were to subject himself to the processes of cleaning his carpet." Id. at p. 9. The doctor did not state what Orlick's medical problems were or how cleaning the carpet may adversely affect Orlick's health.

On September 22, 2008, the Housing Administrator sent Orlick a memorandum stating she had received his letter, and she informed Orlick that per his lease he had to maintain the apartment in a clean and safe manner. (Doc. #7-15, p. 7). She sent Orlick a copy of his move-in inspection and noted there was no indication that the carpet was stained when Orlick moved into the apartment. Id. She acknowledged Orlick's request to move to the opposite side of the building, and informed him that the GFHA has a policy that it does not relocate tenants who are in non-compliance with their lease requirements. Id. The Housing Administrator also informed Orlick an inspection of his apartment would occur in a couple of days to ensure that the shower and carpet stains had been cleaned. Id.

On September 23, 2008, Orlick responded that the carpeting is a health hazard for "other" medical reasons, he again requested to move to the opposite side of the building, and stated that if the carpet in his apartment or another apartment is to be replaced, he would pay $100.00 toward a tile floor. Id. at p. 9. That same date, Orlick sent a second letter to the Housing Administrator stating that three years prior he reported that the rugs at the building entrances had been removed. (Doc. #7-16, p. 3). Because the rugs were removed, Orlick alleged he could not

10

properly clean his shoes before entering the building, and the spots on his carpet were the fault of the Housing Administrator for not timely replacing the rugs. Id. at pp. 3-4. Orlick stated that the Housing Administrator should pay to have the spots on the carpet cleaned. Id. at p. 4.

On December 31, 2010, Orlick sent a letter to Simpson contending her instruction to not open the laundry room window while he is in the community room is a health hazard.[9] (Doc. #7-17, p. 2). Orlick alleged that the lack of air circulation contaminated the air in the community room. Id. Orlick complained about the type of fan over the cooking area in the community room and the lack of a ventilation system. Id. He stated that he was being denied his right to breathe fresh air while in the community room. Id. at p. 4. Orlick also alleged that the community room is a fire hazard. Id. He requested that the community room be closed until an inspection could be performed by the health and fire departments.[10] Id. at pp. 5-6.

On January 31, 2011, Orlick sent a letter to Hanson stating he had been denied his right to fresh air in the community room. (Doc. #7-18, p. 2). Orlick alleged that he turned on the exhaust fan to use the microwave in the community room, but it really was not an exhaust fan, and when Orlick walked to the microwave he "was met with an apparent 'cloud' of radiation, which . . . caused [him] considerable medical problems . . . ." Id. Orlick complained that there was no air circulation system to disperse the radiation and no warning signs. Id. at p. 3. Orlick noted ceiling fans are present, but contended they are not adequate to filter radiation, and the refusal to allow him to open the laundry room window while cooking in the community room

---

[9] The laundry room and the community room are across the hall from each other. (Doc. #7-17, p. 2).

[10] In Orlick's complaint, he also complained about "squatters" using the community room. (Doc. #7, p. 11).

constituted abuse of a senior citizen.  Id.  Orlick alleged that several days after using the microwave he had two heart attacks.  Id. at p. 4.  He also stated that the radiation exposure caused damage to his forehead and may have weakened his eyes.  Id.  Along with his letter to defendant Hanson, Orlick sent an excerpt from an article on air pollution, which is the same article Orlick sent to the court as an exhibit, and additionally Orlick sent Hanson an article on the dangers of microwave ovens.  Id. at pp. 5-6.

On April 13, 2012, Orlick wrote a letter to Hanson regarding an electrical fire in the building.  (Doc. #7-2, p. 4).  Orlick complained that the hallways were not cleared of "dangerous air-born substances."  Id.  He stated that it was absurd and ridiculous that the GFHA would rather save money on heating costs than allow fresh air in the common areas of the building.  Id.

On September 11, 2012, Orlick sent Hanson a letter thanking him for placing a fan near the laundry and community rooms, as the fan provided air circulation.  (Doc. #19-1, p. 2).  Orlick noted, however, that the fan was removed.  Id.  Orlick requested that the fan, and another fan that had been in the hallway, be replaced.  Id.  Orlick contended that lack of air circulation is detrimental to his health and may cause cancer.  Id.  Orlick reminded Hanson about the article he sent on indoor air pollution, and noted the importance of fresh air.  Id. at p. 3.

On September 27, 2012, Orlick sent Hanson another letter about the fans.  (Doc. #19-2, p. 2).  He stated that since the fans had been removed Orlick was required to wear "special protective glasses" any time he left his apartment, and that the lack of fresh air is detrimental to his eyes and increases the risk of eye cancer.  Id.  Orlick also noted that because he is older, the risk is higher.  Id.  Orlick alleged that the lack of fresh air in the common areas had a negative effect on his eye sight in the past two years.  Id. at p. 3.

12

8.  Animals Dispute

Simpson sent a note to the apartment residents advising them not to feed the rodents around the property. (Doc. #7-19, p. 2). Orlick responded to Hanson that he has a constitutional right to feed wildlife, he will continue to do so, and if Simpson desires him to stop feeding the animals she should file for an injunction in federal court Id. at pp. 4-5.

9.  Eye Health

On June 23, 2008, Orlick requested to have a large exhaust fan mounted in the ceiling of his bedroom directly over his computer desk for his "eye health." (Doc. #7-14, p. 5). He stated that his computer screen had been causing "a great deal of magnetism in the room" which required him to use "eye wash" after using his computer. Id. He stated that he got a new computer, but the computer "contaminate[d]" his flat screen, which caused serious eye issues. Id. Orlick also advised the apartment management that older computers contain mercury which causes eye problems. Id.

10. Eavesdropping

On November 27, 2006, Orlick sent a letter to the Housing Administrator complaining of "elderly old women" who eavesdrop outside his apartment door. Id. at p. 2. He requested that an official notice providing a warning about eavesdropping be posted in the building. Id. On May 7, 2008, Orlick again complained about eavesdropping by older women. Id. at p. 4.

11. Mail Tampering

Orlick states that on April 16, 2012, he sent certified mail to Hanson. (Doc. #7-20, p. 2). Orlick states that a postal clerk with red hair acted oddly, as she had done "many times" in the past, upon seeing to whom the mail was addressed. Id. With regard to obtaining a signature for

13

the certified mail, the clerk stated, "I bet he doesn't sign it." Id. Orlick contends the clerk's statement proves she has "intimate knowledge of [Orlick's] business matters . . . ." Id. Orlick alleges the statement also proves that the red haired clerk has an association with Simpson, the clerk has been trying to intercept Orlick's mail, and the clerk is making others aware of where Orlick's mail is being sent. Id.

**Law and Discussion**

Under 28 U.S.C. § 1915(e)(2), the court may *sua sponte* review an *in forma pauperis* complaint and dismiss the action if it is frivolous or malicious, fails to state a claim, or seeks monetary relief against a defendant who is immune from such relief. An action is frivolous if "it lacks an arguable basis either in law or fact." Neitzke v. Williams, 490 U.S. 319, 325 (1989). The term frivolous "embraces not only the inarguable legal conclusion, but also the fanciful factual allegation." Id.

An action fails to state a claim if it does not plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A complaint states a plausible claim for relief if its 'factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Branden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009)). The court must accept the plaintiff's factual allegations as true. Iqbal, 129 S.Ct. at 1949-50. However, "some factual allegations may be so indeterminate that they require 'further factual enhancement' in order to state a claim." Branden, 588 F.3d at 594 (quoting Twombly, 550 U.S. at 557). The facts pled must "give the defendant fair notice of what the claim is and the grounds upon which it rests." Id. (quoting Erickson v. Pardus, 551 U.S. 89, 93

14

(2007) (per curiam)). To satisfy fair notice, a plaintiff must at minimum state the operative facts underlying the claim. Kyle v. Morton High School, 144 F.3d 448, 344 (7th Cir. 1998). *Pro se* complaints are to be construed liberally, but "they still must allege sufficient facts to support the claims advanced." Stone v. Harry, 264 F.3d 912, 914 (8th Cir. 2004) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

A.     Housing Discrimination

The exhibits, which contain the facts underlying Orlick's claims, reveal that Orlick's complaint mostly involves only landlord-tenant disputes which would be governed by state law, and not housing discrimination under the Fair Housing Act, see 42 U.S.C. §§ 3601, et seq. The Fair Housing Act prohibits discrimination on the basis of race, color, religion, sex, familial status, or national origin.[11]  42 U.S.C. § 3604(a) - (e).

The Fair Housing Act makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any renter because of a handicap . . . ." 42 U.S.C. § 3604(f)(1). It also prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap . . . ." 42 U.S.C. § 3604(f)(2).

---

[11] Prohibition of discrimination on the basis of age is not covered by the Fair Housing Act. The Age Discrimination Act prohibits discrimination on the basis of age in programs or activities receiving federal financial assistance. See 42 U.S.C. § 6101, et seq. The Age Discrimination Act requires a plaintiff to exhaust his administrative remedies and properly notify the Secretary of Health and Human Services, the Attorney General of the United States, and the defendants thirty days prior to filing an action in federal court. See 42 U.S.C. § 6104(f) and (e)(1). There are no facts in the record as to whether Orlick exhausted his administrative remedies, and the court has no jurisdiction over claims under the Age Discrimination Act until Orlick exhausts mandatory administrative remedies. Furthermore, Orlick did not specifically state he was bringing claims under the Age Discrimination Act, and Orlick does not allege how his age was a factor in any of the disputes he has had with the defendants.

15

The term "handicap" is defined as a person with "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such impairment, or (3) being regarded as having such an impairment . . . ." 42 U.S.C. § 3602(h). Orlick states in his complaint he is disabled because of an eye condition. (Doc. #7, p. 2).

Nothing in the record supports that Orlick is disabled based on an eye condition. Orlick does not state what the eye condition is or how he is limited in any major life activity by the eye condition. He has submitted no records supporting the alleged eye condition, and it is apparent that Orlick was not regarded by defendants as having such a condition. Orlick's eyes are mentioned in the exhibits supporting the complaint only when Orlick was concerned that radiation from a microwave and lack of fresh air in the common areas weakened his eyes, and when he requested a fan over his computer desk because utilizing the computer was straining his eyes. Additionally, Orlick stated that lack of fresh air may cause eye cancer, but Orlick did not allege that he has ever personally suffered from eye cancer. Orlick's statements and concerns about eye strain and contaminants in the air do not demonstrate that he has a disability due to an alleged eye condition. Orlick has failed to state a claim upon which relief can be granted under the Fair Housing Act and under other federal statutes requiring a showing of disability.

B.     Invasion of Privacy

Assuming without deciding that Orlick has a federal or constitutional right to privacy, his claims fail. Orlick does not allege the defendants eavesdropped outside his apartment door, and there is no basis to hold the defendants responsible for the alleged actions of others. Additionally, Orlick's mail tampering claim is frivolous. In construing the complaint, the court

must weigh all factual allegations in favor of the plaintiff, but need not consider facts that are clearly baseless, fanciful, fantastic, or delusional. Denton v. Hernandez, 504 U.S. 25, 31-33 (1992). Orlick's allegations that the red haired postal clerk has an association with Simpson, that the postal clerk has been trying to intercept Orlick's mail, and that the postal clerk has been trying to make others aware of where Orlick's mail is sent are baseless. Orlick's claims derive from what Orlick deems as odd behavior and on a single statement of the postal clerk, which is completely unrelated to Orlick's allegations.

C.   Remaining Claims

The remaining allegations all relate to landlord-tenant disputes, and are state law claims. Without addressing the sufficiency of these allegations under state law, the state law claims are the only viable remaining claims in the case. This action, notwithstanding plaintiff's unsuccessful attempts to transform it into a federal action, has been and continues to revolve around what are essentially landlord-tenant disputes. It is within the court's discretion to exercise supplemental jurisdiction over state law claims. See 28 U.S.C. § 1367(c)(2) (court may decline to exercise supplemental jurisdiction over a claim if the claim "substantially predominates over the claim or claims over which the district court has original jurisdiction"). "[I]f it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726-27 (1966). In other words, a state-law claim may be dismissed where it "appears that a state claim constitutes the real body of a case to which the federal claim is only an appendage." Id. at 727. Orlick's state law claims clearly and

substantially predominate, and this court should decline to exercise supplemental jurisdiction over his landlord-tenant grievances.

## Conclusion

Orlick has not stated viable and nonfrivolous federal claims for housing discrimination or invasion of privacy. Orlick's action involves what are essentially state law claims. It is **RECOMMENDED** that Orlick's housing discrimination claim be **DISMISSED** with prejudice, Orlick's federal invasion or privacy claim be **DISMISSED** with prejudice, Orlick's state law claims be **DISMISSED** without prejudice, and the court find that any appeal would be frivolous, could not be taken in good faith, and may not be taken *in forma pauperis*.

Dated this 28th day of January, 2013.

/s/ *Karen K. Klein*
Karen K. Klein
United States Magistrate Judge

## Notice of Right to Object

Pursuant to Rule 72(a) and (b), Federal Rules of Civil Procedure, and District of North Dakota Local Court Civil Rule 72.1(D)(2) and (3), plaintiff may object to this Report and Recommendation by filing with the Clerk of Court no later than **February 15, 2013**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.